KWUN BHANSALI LAZARUS LLP
MICHAEL S. KWUN (SBN 198945)
mkwun@kblfirm.com
555 Montgomery St., Suite 750
San Francisco, CA 94111
Telephone: 415 630-2350
Facsimile: 415 367-1539

WUERSCH & GERING LLP
V. DAVID RIVKIN (admitted *pro hac vice*)
david.rivkin@wg-law.com
JUSTIN LEE (admitted *pro hac vice*)
justin.lee@wg-law.com
MICHAEL SENZER (admitted *pro hac vice*)
michael.senzer@wg-law.com
100 Wall St., 10th Fl.
New York, NY 10005
Telephone: 212 509-5050
Facsimile: 212 509-9559

Attorneys for Defendant
FLORAGUNN GmbH

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| ELASTICSEARCH, INC., a Delaware corporation, ELASTICSEARCH B.V., a Dutch corporation,<br><br>Plaintiffs,<br><br>v.<br><br>FLORAGUNN GmbH, a German corporation,<br><br>Defendant. | Case No. 4:19-cv-05553-YGR<br><br>**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO EXCLUDE PORTIONS OF TESTIMONY OF PLAINTIFFS' EXPERT MATTHEW LYNDE**<br><br>Date: October 5, 2021<br>Time: 2:00 p.m.<br>Dept: Courtroom 1, 4th Fl.<br>Judge: Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................1

    A.    Dr. Lynde has not reliably concluded that a "binary" market exists ...................................................................................................................1

    B.    Dr. Lynde has not reliably concluded that all the counted lost customers would have otherwise purchased an Elastic license. ...............6

    C.    Dr. Lynde's opinions are internally inconsistent. .....................................8

    D.    Elastic fails to distinguish the authority cited in floragunn's motion. .....11

CONCLUSION ...................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adobe Sys. Inc. v. Software Tech*,
  No. 5:14-cv-02140-RMW, 2016 WL 4728119 (N.D. Cal. Sept. 8, 2016) ..............................14

*AFL Telecomms. LLC v. SurplusEQ.com Inc.*,
  946 F. Supp. 2d 928 (D. Ariz. 2013) ..................................................................................5

*Beckson Marine, Inc. v. NFM, Inc.*,
  No. C98 5531 FDB, 2007 WL 951706 (W.D. Wash. Mar. 27, 2007) ......................................5

*Brighton Collectible, LLC v. Believe Prod., Inc.*,
  No. 2:15-cv-00579-CAS (ASx), 2017 WL 440255 (C.D. Cal. Jan. 30, 2017) ..................11, 12

*Brighton Collectibles, Inc. v. Coldwater Creek Inc.*,
  No. 08-CV-2307-H(POR), 2010 WL 3718859 (S.D. Cal. Sept. 20, 2010) .............................5

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*,
  923 F. Supp. 2d 1245 (S.D. Cal. 2013) ...............................................................................13

*Cohen v. United States*,
  100 Fed. Cl. 461 (2011) .....................................................................................................13

*Crunchyroll, Inc. v. Pledge*,
  No. C 11-2334 SBA, 2014 WL 1347492 (N.D. Cal. Mar. 31, 2014) ....................................14

*Grouse River Outfitters Ltd. v. Oracle Corp.*,
  No. 16-cv-02954-LB, 2019 WL 8918902 (N.D. Cal. June 21, 2019) ....................................11

*Habersham Plantation Corp. v. Molyneux*, No. 10-61526-CIV-DIMITROULEAS, 2011 WL
  13214323 (S.D. Fla. Sept. 13, 2011) ...................................................................................5

*In re Gen. Motors LLC Ignition Switch Litig.*,
  No. 14-CV-5810, 2017 WL 6729295 (S.D.N.Y. Dec. 28, 2017) ...........................................11

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
  341 F. Supp. 3d 213 (S.D.N.Y. 2018)..................................................................................2

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
  982 F.3d 113 (2d Cir. 2020)................................................................................................2

*Kentucky v. Marathon Petroleum Co.*,
  464 F. Supp. 3d 880 (W.D. Ky. 2020).................................................................................4

*Lam, Inc. v. Johns-Manville Corp.*,
  718 F.2d 1056 (Fed. Cir. 1983)...........................................................................................5

*McGlinchy v. Shell Chem. Co.*,
  845 F.2d 802 (9th Cir. 1988) .............................................................................................12

*Oculu, LLC v. Oculus VR, Inc.*,
   No. SACV 14-0196 DOC(JPRx), 2015 WL 3619204 (C.D. Cal. June 8, 2015)...............12, 13

*Otto v. LeMahieu*,
   No. 4:19-cv-00054-YGR, 2021 WL 1615311 (N.D. Cal. Apr. 26, 2021)...............................12

*Plush Lounge Las Vegas LLC v. Hotspur Resorts Nev. Inc.*,
   371 F. App'x 719 (9th Cir. 2010) ......................................................................................4

*Reiffer v. Shearwater Pac. Cap. Mgmt. LLC*,
   No. 18-cv-06053-JSW (RMI), 2020 WL 7048307 (N.D. Cal. May 13, 2020).........................14

*Reiffer v. Shearwater Pac. Cap. Mgmt. LLC*,
   No. 18-cv-06053-JSW, 2020 WL 7050026 (N.D. Cal. June 22, 2020)....................................14

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
   883 F.2d 1573 (Fed. Cir. 1989)...........................................................................................4

*Stevens Linen Assocs., Inc. v. Mastercraft Corp.*,
   656 F.2d 11 (2d Cir. 1981)............................................................................................13, 14

*Volterra Semiconductor Corp. v. Primarion, Inc.*,
   No. 08-cv-05129-JCS, 2013 WL 6905555 (N.D. Cal. Nov. 18, 2013) ....................................5

*Young v. Cree Inc.*,
   No. 4:17-cv-06252-YGR, 2021 WL 292549 (N.D. Cal. Jan. 28, 2021)..................................12

**INTRODUCTION**

This motion does not just challenge the adequacy of the data underlying Dr. Lynde's analysis. Rather, floragunn seeks to exclude Dr. Lynde's opinions that Elastic ▮▮▮▮ in sales to AESS and IBM Databases because he applied *no methodology at all* in determining that the alleged infringement caused the purported losses.

Dr. Lynde made the unusual choice to measure *Elastic's own a*ctual damages through the sale of allegedly *competing products*, rather than through Elastic's own sales data and records. Having made that choice, Dr. Lynde must set forth a reliable methodology for establishing whether and to what extent AESS and IBM Database sales caused Elastic to lose sales. But instead of doing so, Dr. Lynde simply counts as lost profits (1) *all* sales of AESS for which allegedly infringing features were enabled (at no cost) and (2) *all* sales of IBM Databases. The only basis for this opinion is that Elastic's management claims that a binary market exists between floragunn's alleged infringing product and Elastic's X-Pack product. Based on that representation, Dr. Lynde counts every AESS and IBM Databases sale that contains alleged infringing code as lost business of Elastic, notwithstanding the many other reasons a customer might have chosen AESS or IBM Databases (or a host of other search providers) over Elastic, and notwithstanding Dr. Lynde's opinion that only a small fraction of Search Guard customers would have bought an Elastic license but for the infringement.

Nothing in Elastic's opposition establishes the admissibility of Dr. Lynde's approach to calculating alleged lost profits. Accordingly, floragunn respectfully requests that the Court exclude Dr. Lynde's opinions regarding lost profits allegedly attributable to AESS and IBM Databases.

**ARGUMENT**

A.   **Dr. Lynde has not reliably concluded that a "binary" market exists.**

The underpinning of Dr. Lynde's lost profits analysis is the alleged existence of a "binary" market. However, nothing in Elastic's opposition renders reliable Dr. Lynde's opinion regarding the existence of such a market. In defending Dr. Lynde's opinion, Elastic begins with the uncontroversial and unchallenged observation that an expert may rely on information

1  provided by party witnesses.  *See* ECF No. 178-3, Elastic's Memorandum in Opposition
2  ("Opp.") at 16-17. floragunn does not argue otherwise.  Nor does floragunn dispute that Elastic
3  executives may have knowledge regarding the market in which they operate.  Rather, the issue
4  raised in floragunn's motion to exclude is whether an expert may reliably conclude that the
5  market for AESS, IBM Databases, Search Guard and Elastic's X-pack products is defined by
6  demand for the features enabled by the AIC, such that the only market participants are Elastic
7  and the three products that allegedly employ the AIC.  *See* ECF No. 153, Defendants' Motion to
8  Exclude ("Mot.") at 11-12.  The perspectives of Elastic's executives can be considered, but they
9  cannot render this market conclusion reliable in the face of extensive contradictory evidence and
10 obvious alternative explanations.  *See In re Mirena Ius Levonorgestrel-Related Prods. Liab.*
11 *Litig. (No. II)*, 341 F. Supp. 3d 213, 277 (S.D.N.Y. 2018), *aff'd sub nom. In re Mirena IUS*
12 *Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020) (expert must
13 consider "alternative, and benign, explanations" and collecting cases holding same).  Dr. Lynde
14 fails to consider or dismisses out of hand such contradictory evidence or obvious alternative
15 explanations, rending his opinion unreliable.

16         Nor can the limited documents cited by Dr. Lynde support a conclusion that such a binary
17 market exists.  *See* Opp. at 18.  First, Elastic points to AESS usage information, but that
18 information relates to enablement of the accused features, *not the reasons* AESS customers chose
19 the product.  *See* ECF No. 179, Declaration of David Eberhart ("Eberhart Decl."), Ex. 6
20 (Declaration of Carl Meadows).

21         Second, Elastic claims that Dr. Lynde reviewed Elastic sales information that purportedly
22 shows lost sales to AESS and IBM (Opp. at 18), but nowhere in his reports does Dr. Lynde
23 reference Elastic's sales and financial data in connection with his actual damages opinion for
24 sales allegedly lost to AESS or IBM, and there is no evidence that such data would support Dr.
25 Lynde's conclusions in any event.  In fact, Dr. Lynde reviewed Elastic's CRM data extensively
26 in relation to his assessment of Elastic's alleged lost sales to Search Guard, and reached the
27 conclusion that ████████ of Search Guard customers would have otherwise purchased an
28 Elastic license.  *See* ECF No. 154, Declaration of David Rivkin in support of Mot. to Exclude

("Rivkin Decl."), Ex. H, Lynde Report. Sched. 6N. Such an analysis is conspicuously absent in connection with the AESS and IBM opinions.

Third, Elastic claims that Dr. Lynde relied on AESS marketing and pricing materials. But, again, his report says nothing about how either source of information relates to his opinions that there is a binary market or that each gain for AESS or IBM is a loss for Elastic, and thus there is no reason to believe these materials support Dr. Lynde's conclusion in any way. Finally, Elastic points to its 10-K, which acknowledges competition with Amazon. But that document hardly supports Dr. Lynde's claim of a binary market, and it acknowledges competition with over a dozen companies, including several specifically identified as competing on security. *See* Eberhart Decl., Ex. 1 at 13. Moreover, even if these materials were relevant, and they are not, they cannot overcome Dr. Lynde's acknowledgement in his report that his "binary" market opinion is only based on his conversations with Elastic's executives. *See* Rivkin Decl., Ex. H, Lynde Rpt. ¶¶ 48-49, n.121 (citing only conversations with Mr. Kearns and Mr. Hoffman).

Elastic has also not explained away the ample evidence of alternatives in the search market or the other reasons that may have driven consumer decisions to become customers of AESS or IBM Databases besides the AIC. *See* Opp. at 18-21. First, Elastic makes the tautological argument that because the purchasers of X-Pack or the allegedly infringing products chose those products, they "demonstrated" their desire for those products and thus must not have wanted a different search product or different set of features. Opp. at 19. The argument amounts to the assertion that "the consumer chose the product, and therefore the consumer would not have chosen another product." Were this a reliable way to define a market, there would be very little need for economic experts. Of course, this is not a reliable methodology because it does not consider any other obvious reasons that a consumer may have purchased AESS or IBM Databases besides the allegedly infringing features and whether any other product could have met those needs. As noted in floragunn's motion, some of those reasons are: preexisting customer relationships, the strengths of their business models, their market presence and reputations, and the specifics of their software solutions. *See* Mot. at 15.

1    It is also no response that floragunn has not identified a different market, as causation is
2    Elastic's burden.  In any event, floragunn and its expert, Brian Buss, have identified other more
3    plausible markets, including the market for search functionality, which would include, among
4    others, Elastic's competitors ▇▇▇▇▇▇▇.  *See* Mot at 12-13; ECF No. 179-2, Report of
5    Brian Buss, ¶ 51.

6    Finally, that market definition may be a fact question in other areas of the law does not
7    relieve Dr. Lynde or Elastic of its burdens under Rule 702 and *Daubert*.  *See* Opp. at 20.
8    floragunn does not dispute that there may be multiple reasonable definitions of a market in a
9    given dispute, which might require adjudication by a finder of fact.  The issue here is that Dr.
10   Lynde's definition is not reasonable, and thus must be excluded pursuant to the Court's
11   gatekeeping function.  Courts routinely exclude unreliable opinions regarding the definition of a
12   market. *See Plush Lounge Las Vegas LLC v. Hotspur Resorts Nev. Inc.*, 371 F. App'x 719, 720–
13   21 (9th Cir. 2010) (affirming district court's exclusion of experts' testimony regarding proposed
14   market definition where the testimony "fell short of the reliability and relevancy requirements for
15   the admissibility of expert testimony under Rule 702"); *see also Kentucky v. Marathon
16   Petroleum Co.*, 464 F. Supp. 3d 880, 889–90 (W.D. Ky. 2020) (observing that many courts have
17   found a lack of sufficiently reliable expert testimony supporting a proposed market to be grounds
18   to exclude the market definition).

19   Likewise, the patent cases that Elastic cites for the proposition that a two-player market
20   *may* be sufficient evidence of causation do not support the admissibility of Dr. Lynde's opinion.
21   *See* Opp. at 8-9.  As explained, Dr. Lynde has not reliably concluded that all buyers of AESS
22   (with enabled N2N and FGAC features) and all buyers of IBM Databases made their purchases
23   because of the existence of the allegedly infringing features, such that their only alternative was
24   an Elastic Cloud license.  In that respect, the cases Elastic cites offer a useful counterpoint.  In
25   *State Industries*, the District Court found that "there was no acceptable non-infringing method of
26   satisfactorily foaming gas water heaters in the market place." *State Indus., Inc. v. Mor-Flo
27   Indus., Inc.*, 883 F.2d 1573, 1578–79 (Fed. Cir. 1989).  In contrast, there are other alternatives in
28   the search field, as evidenced in part by Dr. Lynde's own opinion that Elastic would not have

captured all of Search Guard's sales if not for the alleged infringement. And in *Lam*, the court held that the existence of a two-supplier market was a reliable basis for "an award *based on projected lost sales*," not a basis to conclude that the IP holder would have made all infringing sales. *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1068 (Fed. Cir. 1983).

The cited District Court decisions are no more helpful to Elastic's argument. In *Volterra*, the court held that the existence of a two-supplier market might support a price erosion theory of damages – not an inference that the plaintiff would have made all infringing sales. *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. 08-cv-05129-JCS, 2013 WL 6905555, at *19 (N.D. Cal. Nov. 18, 2013). In *Beckson,* it was apparently undisputed that the plaintiff and defendant were "the two sole market suppliers of the patented '350 portlights." *Beckson Marine, Inc. v. NFM, Inc.*, No. C98 5531 FDB, 2007 WL 951706, at *1 (W.D. Wash. Mar. 27, 2007). In *AFL*, the expert assumed the defendant would have made all of the plaintiff's sales, but "because Mr. Crowder has provided detailed calculations, the numbers can be adjusted according to the findings of the trier of fact with regard to lost sales." *AFL Telecomms. LLC v. SurplusEQ.com Inc.*, 946 F. Supp. 2d 928, 947 (D. Ariz. 2013). Likewise, the *Brighton* expert "[did] not seek to tell the jury what ratio to apply to the lost profits, but how to calculate damages reliably once they have determined the proper ratio based on evidence at trial; in fact, the expert suggests that 'should the judge and/or jury wish to consider lost profits resulting from a lost sales transaction ratio other than a one-to-one ratio, they could simply multiply my calculation of lost profits by an alternative lost sales transaction ratio.'" *Brighton Collectibles, Inc. v. Coldwater Creek Inc.*, No. 08-CV-2307-H(POR), 2010 WL 3718859, at *10 (S.D. Cal. Sept. 20, 2010). Unlike the *AFL* and *Brighton* experts, Dr. Lynde *does* intend to tell the jury that the proper ratio is 1:1, and offers no path to adjustment or alternative ratios. Finally, the expert in *Habersham* explicitly disavowed any opinion on causation, with the plaintiff saying he was not a "causation expert." *Habersham Plantation Corp. v. Molyneux*, No. 10-61526-CIV-DIMITROULEAS, 2011 WL 13214323, at *3 (S.D. Fla. Sept. 13, 2011).

/ / /

/ / /

In sum, Elastic has not cited a single case in which an expert was permitted to opine that the copyright holder would have made *all* sales of allegedly infringing products but for the alleged infringement based solely on the existence of purported binary market.

**B.    Dr. Lynde has not reliably concluded that all the counted lost customers would have otherwise purchased an Elastic license.**

Elastic goes on at length about the "robust and careful analysis" Dr. Lynde employed to identify the AESS domains who activated the allegedly infringing features.  Opp. at 4-5; 10-11. But Elastic's argument is a misdirection as this portion of Dr. Lynde's analysis is wholly irrelevant to the reliability question raised in floragunn's motion.  floragunn does not challenge the methodology Dr. Lynde used to estimate the number of users who enabled N2N or FGAC. Rather, floragunn challenges his *next* step, in which Dr. Lynde concludes that *all* such users would have purchased an Elastic license but for the alleged infringement.  Tellingly, Elastic's description of that step is much shorter:

> Dr. Lynde then analyzed the market for managed Elasticsearch services that include security features, including an assessment of the pricing mechanics for the main services and the features available on managed Elasticsearch services. Ex. L (Lynde Dep.) 54-55. He concluded that the only viable competitors are Elastic Cloud and the accused services. Dr. Lynde then opined that the subset of AESS users that enabled accused features—corresponding ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ of N2N-enabled domains— would have purchased Elastic Cloud licenses absent the infringement.

Opp. at 5-6.  Thus, Dr. Lynde concludes that all AESS domains that enabled the N2N and FGAC features would have otherwise become Elastic Cloud customers at ratio of 1:1, without explaining how this conclusion was reached, *e.g.,* what information was consulted, what factors were considered, or what other explanations were evaluated.

Later in the Opposition, Elastic summarizes all the evidence that was available to Dr. Lynde to support his conclusion that every AESS customer who enabled N2N and FGAC would have otherwise bought an Elastic license.  None of it comes close to supporting Dr. Lynde's conclusion.  First, Elastic cites a declaration from Amazon executive Carl Meadows, claiming the declaration "is superior to whatever evidence he could have derived from conversations with a few of AESS's ▆▆▆▆▆▆▆ of users." Opp. at 11.  This is a telling admission because the

1 | Meadows Declaration says *nothing at all* about whether the AESS customers who turned on
2 | features containing the AIC cared about these features or would have bought a license from
3 | Elastic had AESS not contained such features. Instead, Mr. Meadows' Declaration is limited to
4 | an overview of data regarding the total number of domains that enabled the allegedly infringing
5 | features. *See* Eberhart Decl. Ex.6. Elastic then cites an Amazon blog post announcing the
6 | availability of the allegedly infringing features (*id.*, Ex. 9), and the fact that Amazon paid
7 | floragunn ▮▮▮▮▮ for a license to the Search Guard code, purportedly as evidence of the
8 | value of these features.[1] Opp. at 12. Of course, it goes without saying that Amazon saw at least
9 | some value in offering the allegedly infringing features in its AESS product, but that fact does
10 | nothing to support any argument that these features drove significant demand among the
11 | consumers who enabled them (for free), much less that they were responsible for 100% of such
12 | demand, as Dr. Lynde concludes. Finally, Elastic cites the testimony of an Elastic executive that
13 | these features were "critical features for some customers." Opp. at 12. That an Elastic executive
14 | said the allegedly infringing features were important is not a reliable basis for concluding that
15 | Elastic would have captured *all* the allegedly infringing sales of AESS and IBM Databases had
16 | these competitors of Elastic not contained the alleged infringing code.

17 | As to other obvious explanations for why the customers who happened to enable the free
18 | security features chose to purchase an AESS license, Elastic's dismissal is perfunctory: "Dr.
19 | Lynde acknowledged—and investigated—such alternative reasons for demand, and concluded
20 | that the evidence showed users' demonstrated interest in the infringing security features." Opp.
21 | at 12. But as noted above, Dr. Lynde cites no such evidence of demonstrated interest, and
22 | certainly not to the exclusion of all other drivers of demand.

23 | Elastic's explanation of Dr. Lynde's IBM causation analysis is also cursory, stating only:
24 | "Because no other managed Elasticsearch service provided the mandatory security features that
25 | IBM incorporated, Dr. Lynde determined that Elastic Cloud is the only viable, non-infringing

---

[1] The purchase price paid by Amazon was ▮▮▮▮▮▮▮▮▮. *See* ECF No. 162-5, Declaration of David Eberhart in support of Mot. to Exclude Testimony of B. Buss, Ex. C.

1  alternative for users of these instances to obtain these critical security features." Opp. at 6-7.
2  Neither of the two sources of evidence that Elastic cites supports Dr. Lynde's opinion that *all*
3  IBM Databases customers would have purchased a license from Elastic but for the infringement.
4  First, Elastic points to an IBM document that describes *all eleven* plugins available with IBM
5  Databases, and which states that *all* the listed plugins are "already enabled," such that users
6  "cannot install, uninstall, enable, or disable" *any* of them.  Eberhart Decl. Ex. 5 at Ex. 1.   Thus,
7  contrary to Elastic's suggestion, the Search Guard-related plugin is just one of eleven plugins
8  that IBM explicitly touted to its users and that IBM required all users to enable.   Neither Dr.
9  Lynde nor Elastic explains how this one plugin drove *all* demand for IBM Databases, while none
10 of the other touted and mandatory features had any impact whatsoever.  The only other evidence
11 that Elastic cites is "information from Elastic executives with knowledge of the relevant
12 customer base that these features were 'critical features for some customers.'"  Opp. at 13.  That
13 information may be well be accurate for some customers, but it is certainly not a reliable basis to
14 conclude that all IBM Databases customers would have purchased an Elastic Cloud license but
15 for the infringement.

16    In sum, nothing in Elastic's opposition can explain away the fundamentally flawed,
17 circular nature of Dr. Lynde's so-called causation methodology that all AESS customers who
18 turned on N2N and FGAC are lost Elastic customers simply because they turned on these free
19 features, and that all IBM Databases customers are lost Elastic customers simply because they
20 have access to a product with the infringing code.  No evidence of demand is cited, and no
21 attention is paid to obvious alternative explanations for customers' decisions to purchase IBM
22 Databases or exercise a free option to enable N2N and FGAC on AESS.

23    **C.    Dr. Lynde's opinions are internally inconsistent.**
24    Elastic has failed to explain the internal inconsistencies in Dr. Lynde's analysis, which
25 wholly undermine its reliability.  As explained in floragunn's motion, Dr. Lynde opines that only
26 ▮ of Search Guard's customers would have otherwise chosen to become paid Elastic
27 customers of Elastic but for the infringement, while 100% of AESS customers who enabled N2N
28

and FGAC features and 100% of IBM Databases customers would have otherwise chosen Elastic. *See* Mot. at 17.

Elastic attempts to address this enormous discrepancy by pointing out that the usage data Dr. Lynde utilized in estimating the number of AESS and IBM Databases customers does not exist for Search Guard customers. Opp. at 14. Then Elastic asserts that an estimate of the number of customers who enabled the allegedly infringing features constitutes *better information* regarding customer preferences than actual communications and invoices from specific identified customers. *See id.* In other words, according to Elastic, a customer's decision to enable free features is better evidence that this customer would have bought an Elastic license but for the infringement than evidence of what a customer actually told Elastic or floragunn about its purchasing decisions. This argument is simply not logical. It is also not what Dr. Lynde testified to at his deposition, when he admitted ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. ECF No. 169-2, Lynde Dep. Tr. 141:5-143:9.

To be clear, floragunn has never argued that details of any particular lost sale are a condition precedent to a lost profits analysis, and thus the cases that Elastic cites on this point are inapposite. *See* Opp. at 15. But in the absence of any information whatsoever about the actual AESS and IBM Databases customers, Dr. Lynde must offer a reliable methodology for estimating the impact of the alleged AIC on Elastic's business. Simply assuming that all IBM Databases customers and all AESS customers who activated free security features would have otherwise gone to Elastic is not a reliable approach to causation.

Next, Elastic misleadingly suggests that Dr. Lynde's conclusion that ▓▓ of Search Guard customers are lost Elastic customers should be compared to his finding that ▓▓ of AESS domains enabled N2N, rather than his conclusion that 100% of the enabled domains constitute lost customers. *Id.* This makes no sense. All AESS customers who enabled FGAC and N2N had access to the features allegedly supported by the AIC. Likewise, all paid Search Guard customers had access to the features allegedly supported by the AIC. Thus, the Search Guard customers and the N2N and FGAC-enabled AESS customers (not the entire universe of

1  AESS customers) are equivalent in their access to the allegedly infringing features, and thus are
2  the proper subject of an apples-to-apples comparison.  Yet in the case of Search Guard, Dr.
3  Lynde estimates that only ▮ of such customers would have bought a license from Elastic if
4  they could not have accessed the features from floragunn.  In contrast, 100% of the enabled
5  AESS customers would have done so.  Elastic still has not explained this glaring inconsistency,
6  and it renders Dr. Lynde's conclusions entirely unreliable.
7        As to IBM Databases, Elastic does not (and cannot) dispute that Dr. Lynde's conclusion
8  that 100% of IBM Databases customers were lost to Elastic is analogous to his finding that only
9  ▮ of Search Guard customers were lost. Elastic makes no effort to explain the divergence of
10 his opinions, instead merely noting that IBM included information about the allegedly infringing
11 functionality on its website. Opp. at 15 (citing Eberhart Decl. Ex. 5).  This by no means
12 reconciles Dr. Lynde's massively conflicting conclusions; if, as Dr. Lynde assumes, the
13 infringing features were so important to IBM customers such that they all would have found
14 Elastic and bought a license, the same should be true for Search Guard's customers. Yet
15 according to Dr. Lynde's own analysis, the assumption fails.
16        Finally, Elastic appears to argue that the reason only ▮ of paid Search Guard
17 customers constituted lost Elastic customers was that floragunn's Search Guard product for self-
18 managed customers was priced lower than Elastic's X-Pack plugin for self-managed customers
19 (whereas the AESS, IBM Databases and Elastic Cloud managed services are all allegedly
20 comparably priced).  Opp. at 15-16.  As an initial matter, Dr. Lynde did not cite any specific
21 pricing information or comparison in his report to support this contention regarding a pricing
22 difference between X-Pack and floragunn's Search Guard plugin -- other than making an
23 unsubstantiated claim that Search Guard was priced lower than Elastic's X-Pack "in part because
24 Search Guard incorporates Elastic's Infringing Code."  Rivkin Decl. Ex. J, Lynde Reply Rpt., ¶
25 24.  Instead, Elastic cites to Schedule 6B of the Buss Report, which indicates that there is
26 evidence that certain customers chose not to use Elastic's X-Pack because of pricing. But X-Pack
27 contained more features than Search Guard did, and the "pricing" issue was often the fact that
28 customers did not need all the features of X-Pack that Elastic required them to purchase.  Since

Dr. Lynde performs no analysis of Elastic's and floragunn's self-managed security plugin pricing, and certainly not one that would qualify as an "apples-to-apples" comparison, there is no basis for Dr. Lynde to state what, if any, impact price would have had on the demand for each product. Therefore, alleged differences in pricing do not explain the inconsistencies between Dr. Lynde's conclusions regarding sales allegedly lost to floragunn verses his conclusions regarding AESS and IBM Databases.

>   **D.**     **Elastic fails to distinguish the authority cited in floragunn's motion.**

Finally, as detailed below, Elastic is wrong that the case law favors admission of Dr. Lynde's testimony. *See* Opp. at 20-25.

In *Grouse River Outfitters,* the expert concluded, without any factual basis, that 100% of the difference between the plaintiff's projected sales and its actual sales was attributable to the defendant's alleged misconduct. *Grouse River Outfitters Ltd. v. Oracle Corp.*, No. 16-cv-02954-LB, 2019 WL 8918902, at *9 (N.D. Cal. June 21, 2019). The court excluded the opinion as unreliable because it was based on nothing more than correlation. *Id.* Dr. Lynde's analysis is no better; he counts 100% of allegedly infringing sales by IBM Databases and AESS as lost sales by Elastic without any reliable evidence that such customers would in fact have purchased an Elastic license but for the alleged infringement. As explained, the say-so of management and theoretical switching costs do not constitute reliable support for Dr. Lynde's 1:1 conclusion.

As Elastic notes, the expert opinions in *In re General Motors LLC Ignition Switch Litigation*, were deemed unreliable because of the experts' failure to consider obvious alternative explanations of causation for a car accident. *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-CV-5810, 2017 WL 6729295, at *10 (S.D.N.Y. Dec. 28, 2017). Elastic attempts to distinguish this case by arguing that floragunn has not pointed to obvious alternative explanations for consumers' purchase of AESS or IBM Databases other than the AIC. But the Motion to Exclude is explicit about such alternatives, none of which Elastic chooses to address: *See* Mot. at 12-13.

Further, the expert opinion in *Brighton Collectible* is not analogous. *See* Opp. at 20. In that case, the court rejected a relevance objection (*i.e.,* not a reliability objection) on the basis

that the expert did not control for all variables that might have affected jewelry sales in his analysis. *Brighton Collectible, LLC v. Believe Prod., Inc.*, No. 2:15-cv-00579-CAS (ASx), 2017 WL 440255, at *6 (C.D. Cal. Jan. 30, 2017). Notably, in contrast to Dr. Lynde, the *Brighton* expert relied on the IP holder's sales and projections in calculating lost profits (not the sales of allegedly infringing goods). The court noted that the expert "controlled for certain variables which he viewed as important such as seasonal variation in sales and whether certain products were new." *Id.* Here, in contrast, Dr. Lynde ran no such analysis of Elastic's sales and projections, instead jumping to a 1:1 conclusion based on third party sales that ignores evidence in the record and obvious alternative explanations for the purchase of allegedly infringing products.

Contrary to Elastic's characterizations, the cases cited by floragunn provide ample authority for excluding Dr. Lynde's opinions. To begin, while factually distinct, this Court's decisions in *Otto* and *Young* are instructive. The *Otto* expert's opinions were excluded "where he merely regurgitates information untethered to any methodology and is otherwise speculative." *Otto v. LeMahieu*, No. 4:19-cv-00054-YGR, 2021 WL 1615311, at *5 (N.D. Cal. Apr. 26, 2021). Similarly, Dr. Lynde's "methodology" is to rely on Elastic's executives' opinions on the alleged "binary" market and then assign all sales of the allegedly infringing AESS and IBM goods as lost sales. The expert in *Young* was excluded, in part, for his failure to offer a "causal link between the purported defect and liability." *Young v. Cree Inc.*, No. 4:17-cv-06252-YGR, 2021 WL 292549, at *11 (N.D. Cal. Jan. 28, 2021). Dr. Lynde's causation opinion is similarly lacking, where causation is based on nothing more than an untested binary market assumption.

floragunn's other cited authority all support the proposition that a causation expert must rest his opinion on reliable information and assumptions. The expert in *McGlinchy* was excluded because "he attributed all of the future lost profits to acts of Shell Oil Company," rather than "specific acts." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 806 (9th Cir. 1988). Dr. Lynde's opinion is similarly vague, as he attributes all allegedly infringing sales to the infringement, without any specific indication of causation. In *Oculu*, the Court excluded an opinion that the defendant "was the sole cause of the drop in web traffic (which then caused a drop in the number

of customers).” *Oculu, LLC v. Oculus VR, Inc.*, No. SACV 14-0196 DOC(JPRx), 2015 WL 3619204, at *21 (C.D. Cal. June 8, 2015). The Court faulted the expert for not "explain[ing] which potential alternative reasons for the drop in website traffic he considered or how he ruled them out," meaning the causation opinion relied only on correlation. *Id.* Similarly, Dr. Lynde has not explained his basis for ruling out all other reasons someone might have bought an allegedly infringing product or why he assumes all such purchasers would have sought an Elastic license. And while *Cohen* involved a damages claim for non-infringed works, the expert's analytical gaps were directly comparable to Dr. Lynde's: the expert found causation without "setting forth any evidence of causation, such as lost customers or cancelled orders," instead simply assuming the infringement caused losses. *Cohen v. United States*, 100 Fed. Cl. 461, 482 (2011).

Elastic also fails to distinguish *Brighton Collectibles*. *See* Opp. at 23-24. First, as noted above, the say-so of Elastic executives and the cited documents are not a reliable basis to conclude that X-Pack is the only other option for consumers of the allegedly infringing product, or that all such customers would indeed have sought a license from Elastic but for the infringement. Second, as also explained, the fact that the AESS users turned on a free feature and that the IBM users selected a product with allegedly infringing features by no means establishes a reliable "nexus" between the infringement and the purchases. That is correlation, not causation. Third, that the expert counted each lost "transaction" as the loss of "2.06 bags" does not alter the court's conclusion that "Wunderlich improperly equates Defendants' infringing sales with Brighton's own lost profits on a scale of 1:1." *Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 923 F. Supp. 2d 1245, 1254 (S.D. Cal. 2013).

Next, Elastic attempts to compare Dr. Lynde's inclusion of all AESS customers who enabled N2N and FGAC for free to the *Stevens Linen* expert's inclusion of all customers who had made a purchase from both the plaintiff and then the defendant. Opp. at 24.[2] There is no comparison. As the *Stevens Linen* court noted, "we can reasonably believe that these customers

---

[2] Additionally, this distinction does nothing to salvage Dr. Lynde's IBM opinion, which counts all purchasers as lost Elastic customers.

of Stevens had a demand for this type of fabric and were shifting their purchasing to the cheaper infringing fabrics and away from Chestertown." *Stevens Linen Assocs., Inc. v. Mastercraft Corp.*, 656 F.2d 11, 15 (2d Cir. 1981).  This methodology would be equivalent to Dr. Lynde only counting as lost profits those customers who had first purchased a license from Elastic and then shifted over to AESS or IBM Databases, a methodology that might well have offered a reliable way to measure damages here (even if just based on an estimate of such customers).  But that is a methodology that Dr. Lynde did not employ.

Finally, while the "default judgment" decisions do not arise in the context of *Daubert,* they nonetheless offer useful guidance on the kinds of damages theories that courts will accept. In *Crunchyroll*, the "chain of causation" was not only broken by pricing.  *See* Opp. at 24-25. The Court also observed that "YouTube.com and Crunchyroll.com are different websites which attract a different client base," and in addition to being free, another reason that many of the YouTube viewers may have watched the shows at issue was "because they were on YouTube." *Crunchyroll, Inc. v. Pledge*, No. C 11-2334 SBA, 2014 WL 1347492, at *20 (N.D. Cal. Mar. 31, 2014).  Likewise, one of the many reasons that a customer may have bought a product from AESS or IBM was because the product was offered by AESS or IBM (two of the largest and most famous companies in the world)—an extremely reasonable possibility that Dr. Lynde ignores.  With respect to the *Adobe* case, while the court recognized that some of the infringing goods were sold at a discount, the case still stands for the proposition that a plaintiff may not simply assume it would have made all infringing sales.  *See Adobe Sys. Inc. v. Software Tech*, No. 5:14-cv-02140-RMW, 2016 WL 4728119, at *6 (N.D. Cal. Sept. 8, 2016).  Similarly, the *Reiffer* court recognized that a plaintiff cannot be awarded lost profits based on unsold prints of a copyrighted photograph without "evidence that but for defendant's infringement he would have sold all of the prints." *Reiffer v. Shearwater Pac. Cap. Mgmt. LLC*, No. 18-cv-06053-JSW (RMI), 2020 WL 7048307, at *7 (N.D. Cal. May 13, 2020), *report and recommendation adopted*, No. 18-cv-06053-JSW, 2020 WL 7050026 (N.D. Cal. June 22, 2020). Dr. Lynde's opinion is also devoid of such evidence.

/ / /

In sum, ample authority supports floragunn's motion to exclude Dr. Lynde's 1:1 lost profits analysis.

## CONCLUSION

floragunn respectfully requests that the Court exclude the testimony of Elastic's expert, Dr. Matthew Lynde, regarding Elastic's alleged lost profits attributable to Amazon's and IBM's sales.

DATED: September 21, 2021   **KWUN BHANSALI LAZARUS LLP**

By: /s/ *V. David Rivkin*

MICHAEL S. KWUN (SBN 198945)
KWUN BHANSALI LAZARUS LLP
mkwun@kblfirm.com
555 Montgomery St., Suite 750
San Francisco, CA 94111
Telephone: 415 630-2350
Facsimile: 415 367-1539

WUERSCH & GERING LLP
V. DAVID RIVKIN (admitted *pro hac vice*)
david.rivkin@wg-law.com
JUSTIN LEE (admitted *pro hac vice*)
justin.lee@wg-law.com
MICHAEL SENZER (admitted *pro hac vice*)
michael.senzer@wg-law.com
100 Wall St., 10th Fl.
New York, NY 10005
Telephone: 212 509-5050
Facsimile: 212 509-9559

Attorneys for Defendant
FLORAGUNN GmbH

# CERTIFICATE OF SERVICE

I am an attorney with Wuersch & Gering LLP, counsel for Defendant in the above-referenced proceeding. I hereby certify that on September 21, 2021 I caused the foregoing Defendant's Reply in Support of Motion to Exclude Portions of Testimony of Plaintiffs' Expert Matthew Lynde to be served electronically via CM/ECF upon Plaintiffs Elasticsearch, Inc. and elasticsearch B.V.

*/s/ Michael Senzer*
Michael Senzer