DAVID R. EBERHART (S.B. #195474)
deberhart@omm.com
JAMES K. ROTHSTEIN (S.B. #267962)
jrothstein@omm.com
DANIEL H. LEIGH (S.B. #310673)
dleigh@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, California  94111-3823
Telephone:    +1 415 984 8700
Facsimile:    +1 415 984 8701

Attorneys for Plaintiffs
ELASTICSEARCH, INC. and
ELASTICSEARCH B.V.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| ELASTICSEARCH, INC., a Delaware corporation, and ELASTICSEARCH B.V., a Dutch corporation,<br><br>Plaintiffs,<br><br>v.<br><br>FLORAGUNN GmbH, a German corporation,<br><br>Defendant. | Case No. 4:19-cv-05553-YGR<br><br>**PLAINTIFFS ELASTICSEARCH, INC. AND ELASTICSEARCH B.V.'S REPLY IN SUPPORT OF MOTION TO EXCLUDE PORTIONS OF THE EXPERT TESTIMONY OF BRIAN BUSS**<br><br>Date:    October 12, 2021<br>Time:    2:00 p.m.<br>Judge:   Hon. Yvonne Gonzalez Rogers<br>Dept:    Courtroom 1 – 4th Floor |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................................ 1

II. FLORAGUNN IGNORES MR. BUSS'S FAILURES AS TO ███████ ....................... 1

III. MR. BUSS'S APPORTIONMENT METHODOLOGY IS UNRELIABLE ...................... 2

    A. Mr. Buss's framework is unreliable because it was created for litigation. .............. 3

    B. There was no peer review under controlling law or, for some elements, at all. ................................................................................................................................ 3

    C. The scoring systems that Mr. Buss uses will mislead the jury ................................ 5

    D. Mr. Buss's considerations do not achieve the central aim of apportionment: determining the relative value of infringing and non-infringing code. .................... 6

    E. Mr. Buss's methodology improperly deducts certain business assets. .................... 9

    F. Mr. Buss's framework is inherently unreliable because there is no connection between the intermediate scores and overall conclusion. .................... 10

    G. Mr. Buss's framework is not any more reliable because two courts have declined to exclude it in entirely dissimilar cases without any analysis. ............... 11

IV. MR. BUSS DID NOT RELIABLY APPLY HIS FRAMEWORK .................................. 13

V. CONCLUSION ................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
 738 F.3d 960 (9th Cir. 2013) ............................................................................................... 2, 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
 509 U.S. 579 (1993) ................................................................................................................. 4

*Fahmy v. Jay Z*,
 No. 2:07-CV-05715-CAS(PJWx), 2015 WL 5680299 (C.D. Cal. Sept. 24, 2015) ........................................................................................................................... passim

*Feduniak v. Old Republic Nat'l Title Co.*,
 No. 13-CV-02060-BLF, 2015 WL 1969369 (N.D. Cal. May 1, 2015) ..................................... 3

*Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*,
 886 F.2d 1545 (9th Cir. 1989) ............................................................................................. 7, 10

*Gray v. Perry*,
 No. 2:15-CV-05642-CAS-JCx, 2020 WL 1275221 (C.D. Cal. Mar. 16, 2020) ..................... 10

*In re Breast Implant Litig.*,
 11 F. Supp. 2d 1217 (D. Colo. 1998) ....................................................................................... 3

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
 984 F. Supp. 2d 1021 (C.D. Cal. 2013) ............................................................................ 14, 15

*Kumho Tire Co. v. Carmichael*,
 526 U.S. 137 (1999) ................................................................................................................. 7

*MDG Int'l, Inc. v. Austl. Gold, Inc.*,
 No. 1:07-CV-1096-SEB-TAB, 2009 WL 1916728 (S.D. Ind. June 29, 2009) ....................... 14

*NetFuel, Inc. v. Cisco Systems Inc.*,
 No. 5:18-CV-02352-EJD, 2020 WL 1274985 (N.D. Cal. Mar. 17, 2020) ............................. 10

*Oracle Am., Inc. v. Google Inc.*,
 798 F. Supp. 2d 1111 (N.D. Cal. 2011) ............................................................................ 11, 14

*Oracle Am., Inc. v. Google, Inc.*,
 No. C 10-03561 WHA, 2016 WL 1743154 (N.D. Cal. May 2, 2016) ..................................... 9

*Philips N. Am. LLC v. Summit Imaging Inc.*,
 No. C19-1745JLR, 2021 WL 2118400 (W.D. Wash. May 25, 2021) .................................... 14

*Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*,
 No. CV 13-2451 (DWF/SER), 2016 WL 5496340 (D. Minn. Sept. 28, 2016) ...................... 14

*Softel, Inc. v. Dragon Med. & Sci. Commc'ns Ltd.*,
    891 F. Supp. 935 (S.D.N.Y. 1995) .................................................................................. 7, 9

*Townsend v. Monster Bev. Corp.*,
    303 F. Supp. 3d 1010 (C.D. Cal. 2018) ......................................................................... 14, 15

*Valentine v. Pioneer Chlor Alkali Co.*,
    921 F. Supp. 666 (D. Nev. 1996) ..................................................................................... 3, 4

*Williams v. Invenergy, LLC*,
    No. 2:13-CV-01391-AC, 2016 WL 1725990 (D. Or. Apr. 28, 2016) ................................. 3, 4

## I. INTRODUCTION

floragunn's Opposition largely ignores the substance of Elastic's arguments regarding the lack of reliability of Mr. Buss's model and his failure to reliably apply that model to form his opinions. Indeed, floragunn fails to address in any way the most glaring and impactful error in Mr. Buss's analysis: he treats in an identical fashion profits derived from end user licenses and profits from its █████ and ████████████████████████. Further, floragunn takes fundamentally irreconcilable positions. On the one hand, floragunn argues that Mr. Buss's framework benefits from publication and peer review that ensure its reliability. On the other, it asserts that the published version of the framework is not intended to be strict and thus need not be followed. Likewise, floragunn attempts to connect the ███ score that Mr. Buss calculated to his ultimate apportionment figure of ███ by contending that the ███ figure provides a reliable basis for the ███ figure; but floragunn also attempts to explain the difference between the numbers by stating that the ███ only "informs" the ███ These inconsistencies and failures warrant exclusion of Mr. Buss's apportionment opinions.

## II. FLORAGUNN IGNORES MR. BUSS'S FAILURES AS TO ████████

The vast majority of profits to be apportioned are attributable to floragunn's █████ ████████████████████, yet floragunn fails to address any of the defects in Mr. Buss's "analysis" of those profits. Declaration of David Eberhart in Support of Plaintiffs' Motion to Exclude the Expert Testimony of Brian Buss, Ex. A ("Buss Rpt.") ¶ 15.[1] In multiple ways, Mr. Buss did not reliably apply his framework to this revenue stream. Mot. 21:22-22:22, 24:4-25:2. floragunn does not dispute *any* of the examples Elastic cited; in fact, the word ████████ only once in the Opposition. *See* Defendant's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion to Exclude Portions of the Expert Testimony of Brian Buss ("Opposition" or "Opp.") 4:21-26.

Mr. Buss did nothing to analyze which features drove ████████ interest in ████████ the Search Guard code, and floragunn makes no attempt to demonstrate otherwise. Mr. Buss did not:

---

[1] All references to lettered exhibits are to exhibits of the Declaration of David Eberhart in Support of Plaintiffs' Motion to Exclude the Expert Testimony of Brian Buss.

- 1 -    REPLY ISO MOT. TO EXCLUDE BUSS
4:19-CV-05553-YGR

1  review communications between ▓▓▓ and floragunn, review communications between
2  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ speak to
3  anyone at ▓▓▓▓, speak to anyone at Excelerate, review ▓▓▓▓▓ publicly available marketing
4  materials touting the infringing features, or consider ▓▓▓▓▓ recommendation that users enable
5  infringing features. *See* Plaintiffs' Motion to Exclude Portions of the Expert Testimony of Brian
6  Buss ("Mot.") 21:24-22:22. These are precisely the types of evidentiary sources that the "Buss
7  Article" (Ex. G)—which establishes his purported methodology—indicates he should consider.
8  *See* Ex. G, Buss Article at 649-59; *see also* discussion *supra* p. 13.
9      Nor does floragunn offer any defense of Mr. Buss's assignment of identical scores across
10 all 17 considerations (the "Considerations List") for the ▓▓▓▓▓▓▓▓▓▓ for general
11 commercial licenses of Search Guard, other than in a passing statement in a footnote that his
12 failure to "distinguish between floragunn's two revenue streams . . . cannot be grounds for
13 exclusion[.]" *See* Opp. at 3 n.1. But Mr. Buss's acknowledgement that these revenue streams are
14 fundamentally different is irreconcilable with his identical scoring for each. *See* Mot. 24:18-25:2.
15 This careless scoring thus further reveals that Mr. Buss did not reliably apply his framework to
16 the ▓▓▓▓▓▓▓▓.

17 **III.   MR. BUSS'S APPORTIONMENT METHODOLOGY IS UNRELIABLE**
18      For multiple reasons addressed in Elastic's motion, Mr. Buss's apportionment
19 methodology is systematically unreliable: his framework was created for litigation and is not
20 peer-reviewed, his scoring system is flawed and will create a false sense of mathematical
21 precision, his analysis does not achieve the central goal of profit apportionment, and there is no
22 connection between his intermediate "scores" and final opinion. floragunn argues that these
23 criticisms are mere disagreements with his conclusions or "factual issues." *See* Opp. 1:14-17,
24 2:17-20. floragunn is mistaken. Unlike the moving party in *Alaska Rent-A-Car v. Avis Budget*
25 *Group, Inc.*, Elastic challenges Mr. Buss's "general methodology." *See* 738 F.3d 960, 970 (9th
26 Cir. 2013).

### A. Mr. Buss's framework is unreliable because it was created for litigation.

floragunn concedes that Mr. Buss created his profit apportionment framework expressly for litigation. *See* Opp. 6:20-7:2. floragunn contends, however, that Mr. Buss's framework is nevertheless reliable because he did not create it for *this* litigation. *See* Opp. 6:24-25. floragunn cites no authority for its argument, which is contrary to law. For example, in *In re Breast Implant Litigation*, the court excluded an expert's opinions because they were developed for litigation generally: those opinions were "not developed independent of litigation. In fact, the vast majority of [the expert's company's] business comes from plaintiffs involved in breast implant litigation. Whether or not testimony is biased and unreliable because it was developed solely for litigation purposes is an important factor in determining the admissibility of evidence." 11 F. Supp. 2d 1217, 1243 (D. Colo. 1998) (citations omitted); *see also Feduniak v. Old Republic Nat'l Title Co.*, No. 13-CV-02060-BLF, 2015 WL 1969369, at *4 (N.D. Cal. May 1, 2015) (reasoning that "this Court 'may not ignore' that the methodology was not created, and is not used, in the field of valuing real property"). That Mr. Buss developed his framework for experts to use in litigation rather than as part of any accounting practice in the field thus casts doubt on its reliability.

### B. There was no peer review under controlling law or, for some elements, at all.

floragunn argues that Mr. Buss's framework was subject to peer review, s*ee* Opp. 6:1-19, but floragunn's argument conflates publication with the meaningful peer review that *Daubert* contemplates. Courts have contrasted two types of peer review. First, "true peer review," in which "[o]ne investigator makes her methods and findings public, so that others can attack or support her conclusion by following the same protocols while asking what besides the stated principle could account for the documented results." *See Valentine v. Pioneer Chlor Alkali Co.*, 921 F. Supp. 666, 675 (D. Nev. 1996). Second, "editorial peer review," described as "the reference by a journal editor of an article submitted for publication to two or more outside reviewers [who] make confidential comments on the article's scientific accuracy, style, originality and importance, and make a recommendation to the journal that the article be accepted or rejected." *Id.*; *see also Williams v. Invenergy, LLC*, No. 2:13-CV-01391-AC, 2016 WL 1725990, *11 (D. Or. Apr. 28, 2016). But courts have determined that editorial peer review is insufficient under *Daubert*:

1  "Because the scope of editorial peer review is necessarily narrower than true peer review, it is a
2  serious error to conflate the two processes, and, by extension, to assume that because an article is
3  accepted for publication, even in a prestigious scientific journal, that the science it contains is
4  therefore valid." *Valentine*, 921 F. Supp at 675; *see also Williams*, 2016 WL 1725990, at *11.

5  The review of Mr. Buss's framework fell short of "editorial peer review" and never
6  approached "true peer review." Mr. Buss testified that Business Valuation Resources ("BVR")
7  invited him to write the article, "[it] was reviewed[,]" and "[t]here were suggestions and edits
8  from the editor and the editorial team" that were "incorporated in . . . the final version." *See* Ex. F
9  ("Buss Dep. Tr.") 189:18-20, 191:9-22. According to Mr. Buss's description, BVR simply edited
10 the article to prepare it for publication; it did not assess it for accuracy, style, originality, or
11 importance. *See id.* But even if these rudimentary steps—which invited no critical or rigorous
12 review—rose to the level of "editorial peer review," such review does not support admission
13 under *Daubert*. *Cf. Valentine*, 921 F. Supp. at 675; *Williams*, 2016 WL 1725990, at *12.

14 Moreover, two critical aspects of Mr. Buss's methodology—his one-through-five scoring
15 system and the "Kressin Code Classification" (Ex. A, Buss Rpt. Sched. 11)—were never
16 published at all. floragunn concedes that Mr. Buss's scoring provides the sole quantitative basis
17 for his conclusion that ▮ of profits are attributable to the infringement. *See* Opp. 14:3-5 ("▮
18 conclusion…is based on the ▮ number"). Yet floragunn also argues that his scoring scheme
19 need not have undergone publication or peer review because it was "not intended to be
20 computational analysis." Opp. 17:27-28. These positions are irreconcilable: if Mr. Buss's ▮
21 conclusion is based on the ▮ score he calculated in the Considerations List exercise, he should
22 have used a scoring methodology that benefited from publication and peer review to ensure that
23 "substantive flaws in methodology w[ould] be detected." *See Daubert v. Merrell Dow*
24 *Pharmaceuticals, Inc.*, 509 U.S. 579, 593 (1993). The consistency and replicability that peer
25 review helps ensure is even more critical for Mr. Buss's *quantitative* analysis given that the
26 *qualitative* portion of his analysis—according to floragunn—need not follow a "strict formula."
27 *See* Opp. 16:4-18. *Fahmy v. Jay Z* is on point: the court in that case excluded an expert's similar
28 method for quantifying various assets' contribution to profits in part because it had not undergone

- 4 -

REPLY ISO MOT. TO EXCLUDE BUSS
4:19-CV-05553-YGR

1  peer review and was impossible to test. No. 2:07-cv-05715-CAS(PJWx), 2015 WL 5680299, at
2  *4-5 (C.D. Cal. Sept. 24, 2015). The Court should exclude Mr. Buss's opinion for the same
3  reason. Alternatively, if Mr. Buss did not intend his scoring scheme to be rigorous, then Mr.
4  Buss's ▉ conclusion has no reliable basis and should also be excluded.

5       The Kressin Code Classification, likewise appears in no published or peer reviewed
6  source. *See* Mot. 8:26-9:7. In fact, this classification system ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
7  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.
8  *See id.* 4:4-8, 9:23-25, 12:13-22. It is flawed because it only compares infringing code, yet it is
9  the exclusive method that Mr. Buss uses to assess the infringing code elements on an
10 individualized basis. The Opposition offers no explanation for why this ad hoc and unsound
11 method is sufficiently reliable to present to a jury.

12      **C. The scoring systems that Mr. Buss uses will mislead the jury.**

13      Mr. Buss's unpublished scoring system should be excluded, because it is indistinguishable
14 from what the *Fahmy* court rejected due to the substantial risk of misleading a jury. floragunn's
15 arguments to the contrary are without merit.

16      First, Mr. Buss's use of numeric scores rather than the "specific percentages" used in
17 *Fahmy* is an immaterial formatting distinction for the experts' "calculations." *See* Opp. 11:23-
18 12:2. Both experts used quantitative values to assess the level of contribution of infringing and
19 non-infringing assets to profits. *See id.*; *Fahmy*, 2015 WL 5680299, at *3-4. And Mr. Buss's
20 report tabulates a ▉▉▉▉▉▉▉▉▉▉▉▉▉" of ▉%, *see* Ex. A, Buss Rpt. Sched. 12a, and
21 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
22 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.
23 *See id.* Sched. 12b. Moreover, the *Fahmy* court was troubled not only with the expert's use of
24 *precise* numbers (as floragunn suggests, *see* Opp. 12:6-12), but also with the expert's attempt to
25 quantify contribution to revenue *at all*. *See* 2015 WL 5680299 at *4 (finding that it was "unable
26 to identify other academics or experts who have attempted to quantify the factors he identifies, let
27 alone with the specificity contained in his report").

28

Second, *Fahmy* rejected floragunn's argument that Mr. Buss's scores are admissible because they merely "helped inform" his "overall conclusion." *See* Opp. 12:3-6. That court ruled that even if the expert's "use of percentages [was] merely intended to illustrate his analysis," the use of percentages "carrie[d] a substantial risk that the jury w[ould] attach undue weight to the numbers provided[.]" *See Fahmy*, 2015 WL 5680299, at *4-5 (emphasis added). So too here.

floragunn also ignores Elastic's argument that Mr. Buss's scoring system lacks rigor. Just like the untestable method in *Fahmy* that lacked any "objective method[] of reliable calculation," *see* 2015 WL 5680299, at *3-4, Mr. Buss readily admits—and floragunn repeatedly emphasizes—that his scoring scheme is not a "computational process." *See* Opp. 4:20-21, 14:6-8. floragunn likewise provides no response to Elastic's argument that Mr. Buss's scoring system is structurally unsound because it gives equal weight to each consideration, even though the considerations "inevitabl[y]" vary in applicability. *See* Opp. at 3 n.1, 18 n.4. floragunn does not explain how the system can be rigorous when it allows Mr. Buss to give the lowest possible score to irrelevant considerations and, thus, skew the composite score downward. *See* Mot. 12:5-12.

The Kressin Code Classification is similarly flawed because it is a review only of accused code and does not measure (whether objectively or not) the contribution of the infringing code in the context of other elements of Search Guard. floragunn contends that the Court should not scrutinize this methodology because Mr. Buss did not intend it to be part of his apportionment analysis, and that Elastic "conjure[d] up" the ▮ figure. *See* Opp. 15:3-22. But the code classification is the only part of the report that purports to assess the infringing code in any detail, the ▮ appears in Mr. Buss's Schedule 11, and Mr. Buss repeatedly relies on Schedule 11 in forming his apportionment conclusion. *See* Ex. A, Buss Rpt. ¶ 116, Scheds. 11, 12a. That ad hoc classification system should be excluded.

### D. Mr. Buss's considerations do not achieve the central aim of apportionment: determining the relative value of infringing and non-infringing code.

floragunn's Opposition also fails to address how the 17 questions in Mr. Buss's Considerations List have any plausible relationship to the purpose of a profit apportionment analysis. That generally accepted purpose is to compare the "relative contributions" to a

1  defendant's profits of the infringing and non-infringing assets. *See* Mot. 12:23-17:23 (citing
2  *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1549 (9th Cir. 1989)). The
3  Opposition is silent on how the consideration "Where [was Search Guard] purchased?"—or the
4  six other examples of irrelevant inquiries that Elastic lists—could possibly demonstrate the
5  "qualitative importance" of the infringing code to Search Guard sales. *See* Mot. 13:20-14:6 (citing
6  *Softel, Inc. v. Dragon Med. & Sci. Commc'ns Ltd.*, 891 F. Supp. 935, 939-40 (S.D.N.Y. 1995).
7  Nor does floragunn dispute that several considerations, such as "Level of Care in Purchase
8  Decision," parallel the factors that courts assess when analyzing likelihood of confusion in
9  trademark cases, as opposed to profit apportionment in copyright cases. *See* Mot. 15:1-8.

10  This structural flaw in Mr. Buss's framework further distinguishes it from admissible
11  apportionment methodologies such as the qualitative portion of the expert opinion approved in
12  *Fahmy*. *See* Opp. 11:12-13. While the qualitative method in *Fahmy* comprised a systematic
13  review of each factor of a song to assess its importance, 2015 WL 5680299, at *3-5, Mr. Buss's
14  method involves asking 17 questions that are largely unrelated to determining the relative value
15  of each of floragunn's infringing and non-infringing assets. *See* Ex. A, Buss Rpt. Sched. 12a.

16  Nor does the Opposition sufficiently explain why Mr. Buss's 17 considerations should
17  apply in a software copyright apportionment analysis. *See* Opp. at 18 n.4. As Elastic's Motion
18  explained, many have little bearing on that inquiry. *See* Mot. 15:9-16:2. The fact that Mr. Buss
19  designed his framework "for IP litigation generally," Opp. at 18 n.4, is immaterial if that design
20  does not fit the facts of this case. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153-54
21  (1999). And floragunn's concession that "[i]t is inevitable that not all the considerations will be
22  equally applicable to every form of intellectual property" mandates that floragunn explain why
23  Mr. Buss indisputably failed to adjust the weight of each consideration here. *See* Opp. at 18 n.4.
24  But floragunn offers nothing on this point. *See* Mot. 11:24-12:12.

25  floragunn's argument that Mr. Buss has applied his framework in "numerous software
26  cases" also fails, because Mr. Buss testified at his deposition that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Opp. at 18 n.4; Ex. F,
28  Buss Dep. Tr. 194:6-22, 203:17-204:12. It is also of no matter that the framework survived a

*Daubert* challenge in *Stockdale*, *see* Opp. at 18 n.4, where he used it to assess likelihood of confusion in a trademark case that did not involve software. *See* Ex. 3 at pp. 3-6, Sched. 2.

Rather than addressing the basis of Elastic's argument—that the Considerations List and Kressin Code Classification are not designed to perform a proper apportionment analysis—floragunn disputes an argument that Elastic does not make: "Mr. Buss's opinion should be excluded because he did not consider the contribution of non-infringing code and other business assets[.]" *See* Opp. 8:22-24. First, Elastic nowhere objects that Mr. Buss did not consider "other business assets." *See* Opp. 8:22-24. To the contrary, Elastic acknowledges that he did and argues that he should *not* have included many of them because they would be more properly assessed as deductions. *See* Mot. 16:17-17:5.

Second, Elastic's primary objection to Mr. Buss's framework is not that it focuses only on the infringing code; Elastic instead contends that Mr. Buss's list of irrelevant questions does not facilitate sufficient analysis of either infringing or non-infringing code. floragunn's Opposition fails to identify any meaningful analysis of the non-infringing features of Search Guard. *See* Opp. 8:25-9:5. floragunn cites only conclusory statements in Mr. Buss's report that he considered "many features[] and functions of Search Guard use [*sic*] software code unrelated to the Allegedly Infringing Code", and that an expert "must consider all the elements of the Search Guard product." *See id.* (alterations in original). This is not analysis.

Third, floragunn's citation to Schedule 9 of Mr. Buss's report does not establish a meaningful analysis of the relative contributions to the infringing work. *See* Opp. 9:1-2. Schedule 9 merely lists Search Guard features with no commentary about whether a feature uses infringing code, what it does, how it was marketed, or whether and to what extent users demonstrated demand for it. *See* Ex. A, Buss Rpt. Sched. 9. Nor does the list of key assets that Mr. Buss created at step three of his analysis, including his cursory identification of "non-infringing code in Search Guard," offer any proof that Mr. Buss analyzed the relative contributions of the infringing and non-infringing code. *See* Opp. 9:6-17. According to Mr. Buss's report, it is step *four* where an expert assesses the "relative importance" of the assets merely identified at step three, *see* Ex. A, Buss Rpt. ¶ 112, and Mr. Buss's report omits any such step four analysis.

1    Fourth, floragunn argues that Mr. Buss's assessment that infringing code contributed to
2    ■ of floragunn's profits logically implies that he determined that non-infringing assets
3    contributed ■ of profits. *See* Opp. 9:21-10:2. But argument is not analysis, and Mr. Buss did
4    not assess the relative contribution of the infringing and non-infringing aspects of the work.
5    Instead, he considered numerous factors that are irrelevant to copyright damages: the
6    Considerations List is irrelevant to determining the value of infringing software code, and the
7    Kressin Code Classification does not measure the magnitude of each infringing code element's
8    contribution to Search Guard's functionality and appeal. *See* Mot. 12:13-17:23.

9    floragunn also mischaracterizes Elastic's citations for the uncontroversial proposition that
10   Mr. Buss's analysis *must include* an assessment of the "relative contributions" of floragunn's
11   infringing and non-infringing assets to profits. *See* Mot. 12:25-13:19. Elastic did not cite *Softel* to
12   suggest that Mr. Buss should not have "review[ed] other factors" aside from code. *See* Opp. at 10
13   n.3 (citing 891 F. Supp. at 940). Nor did Elastic cite *Oracle America, Inc. v. Google, Inc.*
14   ("*Oracle II*") to suggest that Mr. Buss must use the exact methodology approved in that case (*i.e.*,
15   comparing the volume of infringing and non-infringing lines of the code base). *See* Opp. at 10 n.3
16   (citing No. C 10-03561 WHA, 2016 WL 1743154, at *8 (N.D. Cal. May 2, 2016). Rather,
17   Elastic's objection is that the Considerations List and Kressin Code Classification are not
18   designed to assess the relative contributions to floragunn's profits of the infringing code elements,
19   non-infringing software features of Search Guard, and any other appropriate business assets.

20   **E. Mr. Buss's methodology improperly deducts certain business assets.**

21   Mr. Buss's Considerations List is also improper because some of the business assets that
22   Mr. Buss claims contribute to floragunnn's profits (1) could not reasonably do so or (2) are items
23   that Mr. Buss already deducted from the total profit figure available for disgorgement. *See* Mot.
24   16:3-17:5. floragunn does not explain how any of the "key assets" that Elastic identifies, such as
25   "workforce," drive demand for and sales of Search Guard. *See id.* 16:3-8. Nor does floragunn
26   deny that Mr. Buss deducted the assets "[r]elationships with Freelance coders" and "floragunn
27   website" when both calculating the profit figure available for disgorgement and when
28   apportioning those profits. *See* Mot. 16:17-17:5. floragunn tries to characterize this as a

1  "quintessential fact-intensive dispute going to the factual underpinnings of Mr. Buss's opinion,"
2  Opp. 21:17-26 (citing *Alaska Rent-A-Car*, 738 F.3d at 969-70)—but it is not. In *Alaska Rent-A-*
3  *Car*, the defendant disputed the factual inputs that the expert used for his (unchallenged)
4  methodology for assessing lost profits: the company and regional market that he selected as
5  comparators. S*ee* 738 F.3d at 969-70. Elastic's criticism, however, is that Mr. Buss's framework
6  is structured to improperly deduct defendant's assets at multiple steps in the apportionment
7  process. *See Frank Music*, 886 F.2d at 1549 (stating that "[p]roduction contributions" would be
8  taken into account at the deduction stage rather than the apportionment stage); *see also Gray v.*
9  *Perry,* No. 2:15-cv-05642-CAS-JCx, 2020 WL 1275221, at *16 (C.D. Cal. Mar. 16, 2020)
10 (defining appropriate expenses for deduction in the Ninth Circuit).

### F. Mr. Buss's framework is inherently unreliable because there is no connection between the intermediate scores and overall conclusion.

floragunn's Opposition claims for the first time that Mr. Buss's ▮ conclusion is "based on" the ▮ "Percent of Maximum Score" that is identified in small print at the bottom of his Considerations List exercise. *See* Opp. 14:2-5; Ex. A, Buss Rpt. Sched. 12a. (Neither the concept of a "Percent of Maximum Score," the ▮ result, nor its relationship to the ▮ conclusion appear in the body of Mr. Buss's report. *See* Ex. A, Buss Rpt. ¶¶ 108-119.) Notwithstanding this belated explanation, Mr. Buss's analysis is still an "impermissible black box" that should not be presented to the jury. *NetFuel, Inc. v. Cisco Sys. Inc.*, No. 5:18-CV-02352-EJD, 2020 WL 1274985, at *6–7 (N.D. Cal. Mar. 17, 2020).

First, neither Mr. Buss nor floragunn explains how ▮ becomes ▮. floragunn attempts to elide this difference, claiming that the ▮ score "reflects Mr. Buss's assessment that the relative contribution of the [allegedly infringing code] to floragunn's profits fell into the ▮ range of roughly ▮" See Opp. 13:23-24. Neither this purported "range" nor its basis is presented in Mr. Buss's report. This lack of relationship is not new for Mr. Buss: in the *Versace* case, Mr. Buss calculated a "Percent of Maximum Score" of 6.3% and reached an identical opinion that 10% of profits were attributable to infringement. See Ex. 6 at 9-10, Sched. 3.

Second, floragunn's position that the ▮ score only "informed" Mr. Buss's ▮

- 10 -   REPLY ISO MOT. TO EXCLUDE BUSS
4:19-CV-05553-YGR

1  conclusion is fundamentally irreconcilable with its overall argument. To rebut Elastic's argument
2  that Mr. Buss's ▆ conclusion is not based on his findings, floragunn asserts that the ▆
3  conclusion is in fact "based on" the ▆ score. *See* Opp. at 14:3-5. Yet when trying to explain
4  how the ▆ finding becomes ▆, floragunn argues that the ▆ conclusion is merely
5  "informed" by—in other words, *not* based on—the ▆ score. *See id.* at 14:6-18.

6  Third, floragunn devotes 20 lines of its brief to the mathematics underlying the "Percent
7  of Maximum Score" concept. *See* Opp. 13:2-21. At the same time, floragunn argues that Mr.
8  Buss's scoring scheme is not a "computational process." *See* Opp. 14:6-10. This is also
9  inconsistent. Mr. Buss's quantitative analysis—and the faux precision of floragunn's
10 mathematical explanation—serves no other purpose than to "cloth[e]" his analysis "in an
11 impenetrable facade of mathematics." *See Oracle Am., Inc. v. Google Inc.* ("*Oracle I*"), 798 F.
12 Supp. 2d 1111, 1114, 1119–21 (N.D. Cal. 2011); *see also Fahmy*, 2015 WL 5680299, at *5
13 (finding a "substantial risk that the jury will attach undue weight to the numbers provided").

14 floragunn also does not explain how Mr. Buss used the quantitative calculations in the
15 Kressin Code Classification in his apportionment opinion. *See* Opp. 15:3-22. Instead, floragunn
16 argues that Elastic "wrongly seeks to shoehorn observations from Schedule 11 of Mr. Buss's
17 report into Mr. Buss's apportionment analysis." *Id.* Not so. Mr. Buss specifically cites the
18 Schedule 11 "results" in support of his apportionment opinion. *See* Ex. A, Buss Rpt. ¶ 116 ("As
19 presented at Schedule 11…"), Sched. 12a (citing the percentage of instances of infringing code
20 that "▆
21 ▆"). The disconnect between these figures and Mr. Buss's ultimate conclusion indicates that
22 this, too, is an attempt to obscure an ad hoc analysis with meaningless mathematical precision.

23 **G. Mr. Buss's framework is not any more reliable because two courts have
24 declined to exclude it in entirely dissimilar cases without any analysis.**

25 floragunn cites two cases in which courts declined to exclude Mr. Buss's apportionment
26 opinion. But these are entirely dissimilar cases and the decisions are devoid of any reasoning

1 whatsoever. *See* Declaration of V. David Rivkin, Ex. 4; Ex. 7.[2] They do not counsel admission here, nor do they signify any general acceptance by the courts of Mr. Buss's methodology.

In *Stockdale Investment Group, Inc. v. Stockdale Capital Partners, LLC*, Mr. Buss used a similar list of considerations to assess the *likelihood of confusion in a trademark case*. *See* Ex. 3 at pp. 3-6, Sched. 2. Elastic's Motion noted that many of the considerations appeared derived from a "likelihood of confusion" analysis in a trademark case, Mot. 15:1-8, and were irrelevant to apportioning profits in a software copyright case. *Id.* 13:20-14:27. Although floragunn ignores these arguments in its Opposition, its reliance on *Stockdale* further proves that Mr. Buss's 17 considerations stem from trademark law. Moreover, Mr. Buss's expert report in *Stockdale* does not use any quantitative scoring—a key component here. While floragunn's Opposition includes a Declaration from Mr. Buss claiming that his *Stockdale* opinion included "use of the five-point scoring system," Declaration of Brian Buss in Support of Defendant's Opposition to Plaintiffs' Motion to Exclude ("Buss Decl.") ¶ 15, that scoring system does not appear anywhere in his report and, even if it did, the *Stockdale* plaintiff never challenged it. *See* Ex. 2; Ex. 3.

The non-substantive opinion in *Gianni Versace S.r.l. v. Fashion Nova, Inc.* likewise fails to show any general acceptance of Mr. Buss's methodology in the software infringement context. In that case, Mr. Buss assessed profits attributable to allegedly infringing clothing sold on defendant's fashion retail web site. *See* Ex. 6. Elastic acknowledged that Mr. Buss's Considerations List might make more sense in apportioning profits in a case involving infringing tangible goods such as apparel—the subject of the *Versace* case. *See* Mot. 15:19-21. And Mr. Buss's report in *Versace* did not suffer from many of the same failings that Elastic noted here: e.g., Mr. Buss did not use an ad hoc method analogous to the Kressin Code Classification. Nor did the challenger in *Versace* argue that Mr. Buss failed to reliably apply his methodology or that he made an inexplicable analytical leap from his findings to his apportionment conclusion. *See* Ex. 5. And any similar arguments the challenger did raise appear in less than four pages of a motion in limine. *See id.* at 3-7. The *Versace* court's decision is not persuasive here.

---

[2] All references to numbered exhibits are to exhibits of the Declaration of V. David Rivkin in Support of Defendant's Opposition.

## IV. MR. BUSS DID NOT RELIABLY APPLY HIS FRAMEWORK

Rather than counter any of the inconsistencies that Elastic identifies between the Buss Article and his application of the framework, floragunn argues that the Buss Article offers only optional suggestions. But floragunn cannot simultaneously argue that (1) the "methodology" should be admitted because it was published and (2) the "methodology" is a mere suggestion.

floragunn does not address Mr. Buss's failure to seek out or review broad categories of evidence identified in the Buss Article: customer communications concerning product features, existing customer surveys regarding demand for infringing versus non-infringing features, and floragunn's blogs or white papers promoting the infringing features. *See* Mot. at 20:20-24:3. This is not because such documents do not exist; they do. *See, e.g.*, Ex. I, Ex. J, Ex. N, Ex. O, Ex. P. That Mr. Buss neglected to review such available evidence, and in fact declined to use entire categories of analytical tools at *all*—such as "surveys, reviews and feedback"—represents a failure to follow the essential rules of his own methodology. *See* Ex. G, Buss Article at 649-59. Nor does floragunn contest that (1) Mr. Buss relied on conversations with floragunn's CEO Mr. Kressin in assessing 12 of the 17 considerations, while the Buss Article instructs that management input is the "best fit" for only three, or (2) Mr. Buss did not verify any of Mr. Kressin's statements, even though the Buss Article instructs experts to do so. *See* Mot. 20:20-21:6.

Unable to offer any proof that Mr. Buss applied his framework as published, floragunn replies that the methodology is not intended to be a "strict formula." *See* Opp. 16:4-5. This argument fails for two reasons. First, this is not an accurate representation of the Buss Article, which spends 11 of 19 total pages detailing instructions about what analytical tools to use, the key evidentiary sources for each, and which to use for each of the 17 considerations. *See* Ex. G, Buss Article at 649-59. And the article does not endorse ignoring relevant information; rather, it endorses flexibility in adding relevant information: "If additional questions are relevant to the circumstances of the case, they should be added to the framework" and analysts should ensure "they have considered all of the available information." *Id.* at 655. Second, the mere assertion by Mr. Buss in his new declaration that his analysis "comports" with the article cannot make it so. *See* Buss Decl. ¶ 12. Third, if taken at face value, floragunn's explanation of Mr. Buss's

- 13 -

REPLY ISO MOT. TO EXCLUDE BUSS
4:19-CV-05553-YGR

framework essentially strips it of any rules that would make it reliable under Federal Rule of Evidence 702. If Mr. Buss can so readily dismiss the framework's only published guidelines, then he is merely conducting an ad hoc apportionment analysis without safeguards. Whatever "consistent procedure," Opp. 18:1-7 (citing Ex. G, Buss Article, at 655), the Buss Article purports to establish disappears, and no methodology—let alone a rigorous one—remains. Courts routinely exclude such ad hoc analyses, because they may mislead a jury by presenting a false sense of meticulousness. *See, e.g.*, *Fahmy*, 2015 WL 5680299, at *5; *Oracle I,* 798 F. Supp. 2d at 1119–21; *see also Philips N. Am. LLC v. Summit Imaging Inc.*, No. C19-1745JLR, 2021 WL 2118400, at *9 (W.D. Wash. May 25, 2021) (rejecting apportionment testimony where expert had not used the same type of study or provided any peer-reviewed publications approving of such a study).

Nor is it a sufficient rejoinder that case law does not require Mr. Buss to independently verify information from management. *See* Opp. 19:3-12. Both cases floragunn cites concern challenges to the factual underpinnings of expert testimony; those cases did not concern experts who did not reliably apply a methodology. *See Townsend v. Monster Bev. Corp.*, 303 F. Supp. 3d 1010, 1039 (C.D. Cal. 2018); *Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*, No. CV 13-2451 (DWF/SER), 2016 WL 5496340, at *10 (D. Minn. Sept. 28, 2016). It is Mr. Buss's methodology that required him to independently verify Mr. Kressin's comments (and consider other evidence), and his failure to do so undermined any rigor in his methodology.

floragunn's attempts to distinguish cases cited in the Motion miss the point. The court in *MDG International v. Australian Gold, Inc.* found it significant that an expert failed to verify data because it was his standard practice to do so, just as Mr. Buss did not verify Mr. Kressin's statements in contravention of the Buss Article. *See* No. 1:07-CV-1096-SEB-TAB, 2009 WL 1916728, at *5 (S.D. Ind. June 29, 2009). Similarly, floragunn argues that *In re Countrywide Financial Corp. Mortgage-Backed Securities Litigation* "hardly compels the conclusion that Mr. Buss must consult all possible forms of relevant evidence in his consideration of *17 factors*[.]" *See* Opp. 19:20-22 (discussing 984 F. Supp. 2d 1021, 1025 (C.D. Cal. 2013). But relevant evidence was available to Mr. Buss, his article instructed that he analyze it, and he failed to do so. And floragunn does not explain why the statistical sampling technique at issue in *In re*

- 14 -   REPLY ISO MOT. TO EXCLUDE BUSS
4:19-CV-05553-YGR

1  *Countrywide* must be properly applied but that Mr. Buss's methodology need not be: if Mr.
2  Buss's methodology need not be applied rigorously, then it, too, does not satisfy *Daubert*.
3      Finally, floragunn considers it contradictory that Mr. Buss must consider evidence other
4  than management input while Elastic's expert Dr. Lynde may rely "purely on the say-so of
5  Elastic's management[.]" *See* Opp. 20:10-15. Not so. First, this premise is flawed: Dr. Lynde did
6  not rely solely on interviews with knowledgeable Elastic executives; he also relied on hundreds of
7  documents in forming the relevant opinion. *See* ECF No. 154-9 ("Lynde Rpt.") ¶ 12, App'x II;
8  ECF No. 179-17 ("Add'l Lynde Dep. Tr.") 57:9-60:9. His expert testimony is therefore analogous
9  to that permitted in the *Townsend* decision on which floragunn relies. *See* 303 F. Supp. 3d 1010,
10 1039 (C.D. Cal. 2018) (admitting expert testimony based on information from defendants'
11 executives and also various legal documents, and publicly available information). Second,
12 floragunn identifies no publication by Dr. Lynde that suggests steps that he failed to take. Third,
13 floragunn ignores that Mr. Buss did not reliably apply his published methodology. Federal Rule
14 of Evidence 702 requires that an expert reliably apply their chosen methodology. Mr. Buss
15 selected this methodology and must follow its rules, or his testimony should be excluded.

## V.  CONCLUSION

For the foregoing reasons, the Court should enter an Order excluding Mr. Buss's opinion testimony regarding profit apportionment.

Dated: September 28, 2021

DAVID R. EBERHART
JAMES K. ROTHSTEIN
DANIEL H. LEIGH
O'MELVENY & MYERS LLP

By:  /s/ David R. Eberhart
         David R. Eberhart

Attorneys for Plaintiffs
ELASTICSEARCH, INC. and
ELASTICSEARCH B.V.